**WRONKO LOEWEN BENUCCI**
Michael Poreda, Esq. (025492010)
69 Grove Street
Somerville, NJ 08876
Telephone: (908) 704-9200
Cell: (908) 704-9291
e-Mail: poreda@poredalaw.com
*Attorney for Plaintiff*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MILTON DURHAM, | Docket No. 20-cv-05584 |
| *Plaintiff*, | <u>Civil Action</u> |
| vs. | **AMENDED COMPLAINT** |
| NEW JERSEY DEPARTMENT OF CORRECTIONS, ADMINISTRATOR CHARLES WARREN, ADMINISTRATOR STEPHEN D'ILIO, ADMINISTRATOR STEVEN JOHNSON, ASSISTANT ADMINISTRATOR AMY EMRICH, SERGEANT ORLANDO GIL, SERGEANT JOHANN HINTZ, SERGEANT GERARD DORAN, SERGEANT ANDREW SALMON, SERGEANT LAURA NABORS, SERGEANT JANICE BROWN, OFFICER NICOLE MORRIS (aka NATASHA MORRIS aka NICOLE MARTIN), OFFICER D. MARTIN, OFFICER PHILIP MANDAP, OFFICER TROY BLACK, OFFICER LONNIE. WIGGINS, OFFICER CODY GRONINGER, OFFICER PAUL LEWIS, OFFICER J. EARLY, OFFICER J. HANBY, DERRICK SMITH, OFFICER RAPHAEL DOLCE, OFFICER MARK TYNAN, NURSE LANCE CARVER, NURSE M. OWENS, JOHN DOES 1-4, | |
| *Defendants*. | |

1

Plaintiff, Milton Durham, by way of Complaint against Defendants, says as follows:

**FACTUAL BACKGROUND**

Plaintiff Milton Durham is an inmate in the custody of the New Jersey Department of Corrections. He is currently housed at South Woods State Prison, 215 South Burlington Road, Bridgeton, NJ 08302. His SBI is 784983A.

1.) Durham entered into the custody of the New Jersey Department of Corrections in January 1986 and has been in custody since then. He is next eligible for parole on April 13, 2022, and his maximum sentence expires on May 21, 2022.

2.) Since 2012, he has been the victim of a series of assaults, thefts, and constitutional deprivations at the hands of prison officials, and he continues to be the victim of due process violations.

3.) All individually-named Defendants are current or former employees of the New Jersey Department of Corrections except for Nurse Lance Carver, Nurse M. Owens, and John Does 3-4. These Defendants are employees of University Correctional Health Care.

### *The 2012 Assault*

4.) On May 6, 2012, at approximately 12 noon, Plaintiff was in his cell at New Jersey State Prison in Trenton, New Jersey.

5.) At this time and date, Defendants Sergeant S. Hintz and Officers D. Martin, P. Mandap, T. Black, and John Does 1-2 came to his cell door.

6.) Plaintiff did not know why they were there.

7.) Sergeant Hintz ordered Plaintiff to put his hands through the food port.

8.) Plaintiff asked, "What's going on?"

9.) The Defendants told Plaintiff he was going to be taken out of his cell.

10.) Plaintiff asked where he was going as he started gathering clothes to put on. One of them yelled to the front of the tier, "Bust 22."

11.) Defendants Hintz, Martin, Mandap, Black, and John Does 1-2 opened the cell door, rushed upon the Plaintiff, and threw him to the ground, twisted his hands behind his back and cuffed them.

12.) They began to punch him in the head and kick him in his rib, yelling "Write some of your shit?"

13.) The phrase, "Write some of your shit" was a reference to the fact that Mr. Durham was known to be a frequent writer of grievances.

14.) Sergeant Hintz said, "Get him out of here!"

15.) Two guards grabbed Plaintiff under the arms and jerked Plaintiff out of the cell, ramming his head into a tier of bars.

16.) These Defendants then dragged Plaintiff to the front of the tier.

17.) Waiting at the front of the tier was Defendant Sergeant Brown and several other prison guards, including Nicole Morris.

18.) Defendant Martin then placed his foot on Plaintiff's back, pressing his chest into the steel floor.

19.) At this point Plaintiff began panicking because he was gasping for air.

20.) After a few moments, a prison guard began placing shackles on his ankles. The shackles were applied so tight that they cut into Plaintiff's skin.

21.) Lieutenant Abrams then appeared and said, "Get him up and let him pull up his drawers," as his thermals had been pulled to his knees while he was being dragged.

22.) Plaintiff was then pushed and pulled into the main clinic in the prison by Prison Officer Tynan who continuously squeezed and pulled the cuffs, causing intense pain.

23.) Plaintiff told Nurse Lance Carver that he thought his ribs were broken because Plaintiff was having chest pain and shortness of breath.

24.) The Nurse examined the scrapes on Plaintiff's knees and right ankle and told the Prison Guards, "He's good to go."

25.) The Nurse paid no attention to Plaintiff's chest at all.

26.) The Nurse said that Plaintiff did not need to be in the medical unit and could be put into lock up/the Management Control Unit (MCU).

27.) Plaintiff was taken to the MCU unit for lock up still shackled and cuffed.

28.) Plaintiff was taken to 3BL (North Compound – MCU - N/C) cell 7 and stripped searched.

29.) Plaintiff's watch was taken from him.

30.) For ten days, Plaintiff was left in his underwear in the cold, in pain, and gasping for air.

31.) For those ten days, he was left untreated and suffering from what would later be discovered were broken ribs and a collapsed lung.

32.) Several days into Plaintiff's ordeal of chest pain and gasping for air, Plaintiff learned that Sergeant Hintz had appeared at his cell on May 6, 2012 due to a report by Defendant Nicole Morris that Plaintiff had made a threatening gesture with a telephone cord from his cell.

33.) Plaintiff never made these gestures.

34.) On each day that passed that Plaintiff was locked in a cell with broken ribs and a collapsed lung, Plaintiff pleaded for medical attention to Defendant Nurse M. Owens who made rounds with medication the majority of the days each week.

35.) Nurse Owens refused all requests for medical treatment. Plaintiff did not even get Motrin for the pain of his cracked ribs.

36.) Plaintiff submitted two written requests for medical aid.

37.) On May 13, 2012, seven days after the beating, Plaintiff got the attention of a triage nurse, Nurse Rapp, who contacted a Nurse Practitioner named Carol Gallagher. Nurse Practitioner Gallagher ordered a chest x-ray.

38.) On May 14, 2012, eight days after the beating, Plaintiff was finally given a chest x-ray.

39.) On May 15, 2019, Plaintiff was rushed from his MCU cell on 3BL to the emergency room by ambulance to St. Francis Medical Center.

40.) Plaintiff was finally diagnosed by Dr. Seinfeld and Dr. Geller with broken left ribs and collapsed left lung.

41.) Plaintiff was admitted to the hospital for treatment of his severe bodily injuries, namely, his broken ribs and collapsed lung.

42.) After three days in the hospital, Plaintiff was released back to New Jersey State Prison infirmary where he was lodged in a cell with no hygiene products, stained sheets, and no pillow.

43.) On May 21, 2012, a hearing officer conducted a hearing related to the allegations by Defendant Nicole Morris that Plaintiff had made threatening gestures with a telephone cord. This hearing took place in the infirmary.

44.) Plaintiff was charged with infractions .803/.*002 and .803/*.003 for attempted and actual assault.

45.) Both the .803/.*002 and .803/*.003 were sustained.

46.) Plaintiff has since learned from a fellow inmate named Jimmy Martin, who is in a romantic relationship with Nicole Morris, that Nicole Morris has recanted her story that Plaintiff threatened her with a telephone cord.

47.) On May 21, 2012, Plaintiff was removed from the infirmary and placed back in cell 3BL in the MCU.

### *Stolen Property*

48.) When Plaintiff was dragged out of his cell by Defendants, 9 boxes of his personal property and his television were taken out of his cell.

49.) His watch was lifted off of his person.

50.) On June 19, 2012, he was reunited with only 6 of the boxes.

51.) Still missing are his watch, thousands of pages of legal, personal, religious, business, financial, and intellectual property documents.

52.) Especially hurtful was the theft of phone numbers and addresses, photos of his times and travels before being incarcerated, poems, songs, and manuscripts.

53.) The following Defendants are responsible for the theft of Plaintiff's property: Sergeant Gerard Doran, Sergeant Andrew Salmon, Sergeant S. Nabors, Officer J. Kirby, Derrick Smith, Officer R. Dolce.

### *Filing of the First Complaint*

54.) On June 29, 2012, Plaintiff filed a Notice of Tort claim for the ordeal involving the assault and theft of his property.

55.) Plaintiff initially mailed his Complaint regarding this matter to the Superior Court of New Jersey – Mercer County on April 24, 2014, a fact of which Plaintiff has documentary proof. Plaintiff sought a fee waiver to file as an indigent.

56.) The Court issued a May 7, 2014 Notice that the Complaint was received but not filed because the fee waiver application required a 6-month prison account statement.

57.) However, due to the negligence or intentional destruction of the Court's Notice by prison staff who inspect all prisoner mail, Plaintiff did not receive this Notice.

58.) On or about June 8, 2014, Plaintiff's legal advisor Yehuda McDaniel called the Court and spoke to a judge who told Mr. McDaniel that Plaintiff's Complaint was "on his desk and would be processed shortly."

59.) When Plaintiff got no response, he wrote a letter dated August 16, 2014 to the Court inquiring why he had not received a response to his Complaint mailed to the Court on April 24, 2014.

60.) On November 22, 2014, he received a notice from the Court marked "received, but not filed" asking Plaintiff to attach a 6-month prison account statement.

61.) Plaintiff returned the 6-month prison account statement to the Court on November 29, 2014, a fact of which he has documentary proof.

62.) According to public court records, the case was filed and docketed on January 12, 2015 as MER-L-99-15.

63.) Plaintiff would not find out about the existence of the docket number until November 29, 2017.

64.) A deficiency notice was sent to Plaintiff on February 2, 2015, which Plaintiff also did not receive.

65.) The complaint was allegedly dismissed without prejudice on March 2, 2015 (see below), supposedly due to "18 months of inactivity" even though the Complaint had been received by the Court fewer than 12 months prior.

66.) The Court received another copy of Plaintiff's six-month account statement in June 2015.

67.) The Court sent Plaintiff another deficiency notice on July 21, 2015 requesting a different format of the 6-month account statement. Plaintiff did not receive this notice.

68.) On September 20, 2017, the Complaint was marked as restored, but Plaintiff did not receive any notification that it had been restored.

6

69.) Sometime between September 20, 2017 and November 29, 2017, Plaintiff sent another inquiry to the Court about the status of his Complaint.

70.) On December 3, 2017, Plaintiff received a letter dated November 29, 2017 telling him that the Complaint, which had been docketed MER-L-99-15, had been dismissed without prejudice on March 2, 2015 due to 18 months of inactivity even though the Complaint had been received by the Court fewer than 12 months before March 2, 2014.

71.) There is no court order dismissing the case.

72.) On January 30, 2018, Plaintiff filed a records request form with the Court requesting the complete file of "letters, certifications, and motions filed" subsequent to the May 7, 2014 deficiency notice.

73.) The Court did not respond to this request.

74.) On February 14, 2018, Plaintiff sent a letter to the Court asking that his case be reinstated.

75.) When there was no response, Plaintiff simply re-filed the case, which was docketed as MER-L-874-19.

76.) On February 28, 2020, MER-L-874-19 was consolidated with ESX-L-1249-19 (which alleged another prison assault) under the docket number MER-L-874-19.

77.) On May 6, 2020, the consolidated action was removed to federal court.

### *February 3, 2017 Assault*

78.) On February 3, 2017 at approximately 7:30pm, Plaintiff was in his cell at New Jersey State Prison Semi-Solitary Confinement on 7 Tier, 7 Up.

79.) Sergeant Orlando Gil and Officers L. Wiggins and C. Groninger stopped at his cell door and told him he was going to Pre-Hearing Detention (PHD) lock up.

80.) Plaintiff became nervous because the assault in 2012 began with a similar situation.

81.) Plaintiff asked why he was being locked up, and Sergeant Gil said that he would inform Plaintiff when they got to PHD lock up.

82.) Plaintiff passed out his clothing for a strip search, and then he got dressed again.

83.) Plaintiff asked for a camera escort because he feared for his safety.

7

84.) Sergeant Gil said, "No" and then left the area for a few minutes.

85.) When Gil returned, he sprayed Plaintiff in the face with mace for no reason.

86.) Plaintiff was told to drop to his knees, which he did.

87.) Sergeant Gil then stated, "When that door opens, fuck him up!"

88.) The door opened, and Plaintiff tried to make his way to the door half-blinded with mace.

89.) Sgt. Gil, Wiggins, and Groninger grabbed Plaintiff and threw Plaintiff to the floor.

90.) They began to kick and punch Plaintiff.

91.) After the beating, Sergeant Gil dismissed Wiggins and Groninger, who were replaced by Officers P. Lewis and J. Early, for administering "negative contact."

92.) Early and Lewis placed Plaintiff's hands in cuffs. J. Early tightened the cuffs so tightly that his hands went numb and his wrists bled.

93.) Plaintiff was taken to the Prison Clinic where Nurse Xiangrong Zhou cleaned his face and eyes and requested that the cuffs be loosened. Sergeant Gil said, "No!"

94.) Plaintiff was taken to a Forensic Unit and stripped naked. He was given only a mace-infested quilt.

95.) Plaintiff was left in the cell naked and burning from the mace for five days.

96.) Plaintiff learned in this cell that he had been beaten and locked up due to an accusation that he had been on a prohibited 3-way call with his sister-in-law and the Atlantic County Prosecutor's Office.

97.) Plaintiff was on no such call.

98.) Plaintiff was given no antidote for the mace, and he experienced burning sensations for weeks after the assault.

99.) Plaintiff experienced nerve damage in his hands from the overly tight handcuffing.

100.) Plaintiff needed physical therapy for the back and leg injuries he suffered from the assault.

101.) Plaintiff continues to experience back and leg pain from the assault.

102.) Plaintiff filed a motion to submit a late Notice of Claim for this assault but never got any response.

## *Phone Call Infraction*

103.) Plaintiff was initially charged with a .*002 for assaulting an officer and a .701 for unauthorized use of mail or telephone.

104.) The .*002 was dismissed, but not the .701.

105.) Plaintiff filed a request to get more time to file an appeal.

106.) Instead, the prison denied the appeal, even though no appeal had ever been filed.

107.) Plaintiff appealed the decision to the Appellate Division of the Superior Court of New Jersey.

108.) On July 18, 2018, the Appellate Division remanded the case so that Plaintiff could file his appeal. On 8/7/18, Plaintiff submitted an 11 page appeal signed by a lieutenant, but prison officials told him they never received it.

109.) Plaintiff wrote another 19 page appeal, but the prison refused to accept his submission of it on at least four occasions.

110.) Assistant Administrator Amy Emrich falsely said she received the appeal. Without ever looking at Plaintiff's appeal, she denied it.

111.) Denial of the appeal resulted in loss of commutation time, and it set back Plaintiff's parole date.

## COUNT 1
### Battery

112.) When prison officials beat, cuffed, and dragged Plaintiff in 2012, they caused harmful and offensive contact constituting battery.

113.) When prison officials sprayed mace in Plaintiff's eyes, beat him, and cuffed him so tightly that it caused him to bleed and caused nerve damage in 2017, they caused harmful and offensive contact to Plaintiff constituting battery.

114.) The guard who shackled Plaintiff's ankles so tightly in 2012 that they broke his skin committed harmful and offensive contact.

115.)   These actions occurred in the discharge of the duties of the employees of the New Jersey Department of Corrections.

116.)   The batteries inflicted painful and permanent injuries on Plaintiff.

## COUNT 2
### Intentional Infliction of Emotional Distress

117.)   In order to retaliate against him from writing grievances, prison officials beat Plaintiff to the point that his ribs were broken, and his lung was punctured.  He was then left in a cold cell without medical treatment for eight days.

118.)   To add insult to injury, his personal property was stolen while in disciplinary lockup on false charges that he'd made a threatening gesture to Nicole Morris.

119.)   This string of events constitutes extreme and outrageous conduct, which caused Plaintiff extreme emotional distress.

120.)   When prison officials sprayed mace in Plaintiff's eyes, beat him, tightened the cuffs to the point that Plaintiff bled, and left Plaintiff naked and burning in a cold cell in 2017, their acts were extreme and outrageous and caused Plaintiff extreme emotional distress.

121.)   These actions occurred during the discharge of duties of the employees of the New Jersey Department of Corrections.

## COUNT 3
### Negligent Hiring, Training, & Supervision

122.)   Defendants Charles Warren, Steven Johnson, and Steven D'Ilio were administrators at New Jersey State Prison.

123.)   Warren, Johnson, and D'Ilio had a duty to ensure the safety of all prisoners at New Jersey State Prison.

124.)   They breached this core duty to Plaintiff, proximately causing permanent loss of bodily function, specifically – nerve damage and reduced range of motion.

125.)   In furtherance of this core duty, they had a duty not to hire prison guards with known propensities for violence.

126.)   In furtherance of the core duty to protect inmate safety, they had a duty to ensure the appropriate training of all subordinates.

127.)   In furtherance of the core duty to inmate safety, they had a duty to supervise all subordinate officers.

128.) Defendants Warren, Johnson, and/or D'Ilio hired or were otherwise responsible for hiring of Defendants Hintz, Brown, Gil, Black, Mandap, Martin, Wiggins, Groninger, Early, Lewis, and John Does 1-2.

129.) Hintz, Brown, Gil, Black, Mandap, Martin, Wiggins, Groninger, Early, Lewis, and John Does 1-2 all had propensities for violence which, but for the failure to exercise due care in the screening of job applicants, Warren, Johnson, and D'Ilio would have realized.

130.) Alternatively, Warren, Johnson, and/or D'Ilio actually did know about the violent propensities of Hintz, Brown, Gil, Black, Mandap, Martin, Wiggins, Groninger, Early, Lewis, and/or John Does 1-2, but they hired them anyway.

131.) Hiring and screening prison guards is a mandatory duty of Defendants Warren, Johnson, and D'Ilio.

132.) Defendants Warren, Johnson, and D'Ilio had a duty to make sure all subordinate officers were properly trained in use of force against a prisoner, including but not limited to the use of mace and handcuffs.

133.) The duty to insure proper training is a mandatory part of the jobs of Warren, Johnson, and D'Ilio.

134.) Defendants Warren, Johnson, and D'Ilio had a duty to supervise all subordinate officers so that they did not use excessive force against a prisoner.

135.) Adequate supervision included, but was not limited to: requiring prior approval by a supervisor for actions, such as the invasion of Plaintiff's cell, that could escalate to guard-on-prisoner violence; maintaining and regularly carrying out appropriate investigations of guards' use of force; maintaining video surveillance of all areas of the prison where guards might perpetrate violence on prisoners; intervening and disciplining officers who showed a propensity to use excessive force.

136.) These duties were a mandatory part of the jobs of Warren, Johnson, and D'Ilio.

137.) Defendants Warren, Johnson and D'Ilio were negligent in their duties to train and supervise the Defendants who carried out the beatings, mace attack, and hand-cuffing of Plaintiff.

138.) As a proximate result of the negligent training and supervision, Plaintiff suffered damages, including permanent loss of bodily function, specifically, nerve damage and a loss of range of motion.

139.) Had Warren, Johnson and D'Ilio properly trained and supervised the other Defendants, Plaintiff would not have suffered damages.

140.) Additionally, Sgts. Hintz and Brown had a duty to supervise Officers Black, Mandap, Martin, and John Does 1-2 such that they should have stopped their subordinates from beating the Plaintiff.

141.) This duty was a mandatory part of the jobs of Hintz and Brown.

142.) Sgts. Hintz and Brown failed to stop their subordinate officers and thereby breached their duty to supervise Officers Black, Mandap, Martin, and John Does 1-2.

143.) Likewise, Sgt. Gil had a duty to supervise Officers Wiggins, Groninger, Lewis, and Early.

144.) This duty was a mandatory part of Gil's job.

145.) Sgt. Gil failed to stop his subordinate officers from using excessive force on Plaintiff, and thereby breached his duty to supervise Officers Wiggins, Groninger, Lewis, and Early.

146.) As a proximate result of the breach of duties of Hintz, Brown, and Gil to stop subordinates from assaulting Plaintiff without cause, Plaintiff suffered damages, including permanent loss of bodily function, specifically, nerve damage and loss of range of motion.

147.) Sgt. Hintz, Sgt. Brown, Sgt. Gil, and Officers Black, Mandap, Martin, Wiggins, Groninger, and John Does 1-2 all had known propensities to use excessive force on prisoners.

148.) This known propensity placed upon Defendants Warren, Johnson, and D'Ilio a supervisory duty to intervene, discipline, and exert greater scrutiny upon these officers with known violent propensities.

149.) This duty to intervene was a mandatory part of the job of Warren, Johnson, and D'Ilio.

150.) Defendants Warren, Johnson, and D'Ilio all breached their duty to supervise when they failed to take remedial measures regarding the known violent propensities of Sgts. Hintz, Brown, and Gil and Officers Black, Mandap, Martin, Wiggins, Groninger, and John Does 1-2.

151.) This failure proximately caused Plaintiff damages, including permanent loss of bodily function.

152.) Sgt. Hintz, Sgt. Brown, and Sgt. Gil were untrained and/or had a history of being unable to control subordinates in tense and potentially violent situations.

153.) Defendants Warren, Johnson, and D'Ilio all breached their duty to supervise when they failed to take remedial measures regarding the known incompetencies of Sgts. Hintz, Brown, and Gil because these incompetencies endangered the lives of prisoners like Plaintiff, to whom Warren, Johnson, and D'Ilio owed a duty to secure their safety.

154.) These incompetencies proximately caused Plaintiff's damages, including permanent loss of bodily function.

155.) The New Jersey Department of Corrections is liable via the theory of respondeat superior for all negligence of Warren, Johnson, D'Ilio, Hintz, Brown, and Gil.

## COUNT 4
### 42 U.S.C. § 1983 – Fourth and Eighth Amendment – Excessive Force

156.) Defendants who beat and cuffed and dragged Plaintiff in 2012 and left him in a cell in his underwear for eight days engaged in cruel and unusual punishment of Plaintiff, in violation of the Eighth Amendment.

157.) Defendants who maced, beat, cuffed and dragged Plaintiff in 2017 and left him in a cell in his underwear, burning from mace engaged in cruel and unusual punishment of Plaintiff, in violation of the Eighth Amendment.

158.) In both the 2012 and 2107 incidents, the amount of force used against Plaintiff was out of proportion to any threat posed by Plaintiff and was used cruelly and sadistically.

159.) The excessive tightness of cuffs and dragging perpetrated by Defendant Tynan in 2012 was an incident of excessive force.

160.) The excessive tightness of cuffs perpetrated by Defendant Early in 2017 was an incident of excessive force.

161.) In 2017, when Sgt. Gil refused to follow Nurse Zhou's recommendation that Plaintiff's handcuffs be loosened, he became responsible for excessive force in violation of the 4th and 8th Amendment.

162.) The excessive tightness of the handcuffs in the 2017 incident caused Plaintiff permanent nerve damage.

## COUNT 5
### 42 U.S.C. § 1983 – Eighth Amendment – Deliberate Indifference to a Serious Medical Need

163.) When Plaintiff was brought before Nurse Lance Carver complaining of chest pain and shortness of breath following the 21012 beating, he presented with clear signs of broken ribs and a collapsed lung.

13

164.) The obvious signs of a serious medical condition included Plaintiff's difficulty breathing and shortness of breath and his reports of pain in the chest.

165.) Carver did not even examine Plaintiff's chest, deliberately ignoring Plaintiff's obvious signs of a collapsed lung and broken ribs.

166.) On information and belief, Carver was part of the conspiracy to assault Plaintiff. The assault was carried out by Hintz, Brown, and their subordinates while Carver was on staff with the knowledge that Carver would say that Plaintiff had not been seriously injured and thus help the assailants cover up their wrongdoing.

167.) Carver gave the OK to place Plaintiff in the MCU instead of recommending that he remain in the medical unit while he had trouble breathing or recommending a chest x-ray or recommending that he go to the hospital.

168.) Carver intentionally did this so that Plaintiff would be taken out of the medical unit, away from the observation of other prison medical staff who might point out his deliberate indifference.

169.) Nurse Owens, who ignored Plaintiff's cries for medical attention for eight days while he was suffering from broken ribs and a collapsed lung, was deliberately indifferent to Plaintiff's serious medical condition.

170.) John Does 3-4 who were responsible for reviewing Plaintiff's written requests for medical aid during his eight days in the MCU were deliberately indifferent to Plaintiff's serious medical need.

171.) When Sergeant Gil refused to follow Nurse Zhou's request to loosen the handcuffs so as to avoid potential nerve damage and stop the use of excessive force, Sergeant Gil was deliberately indifferent to a serious medical need.

## COUNT 6
## 42 U.S.C. § 1983 – First Amendment

172.) The motivation for the 2012 and 2017 assaults was the fact or perception that Milton Durham had written grievances.

173.) A prison grievance is a petition to the government for a redress of grievances. It is therefore explicitly protected by the First Amendment.

174.) When agents of the State of New Jersey conspired to and beat up Plaintiff in order to punish him for writing a grievance and to intimidate him from writing further grievances, they violated Plaintiff's First Amendment rights.

## COUNT 7
### 42 U.S.C. § 1983 – Fourteenth and Fifth Amendments – Deprivation of Property without Due Process

175.)  In failing to return 3 boxes of Plaintiff's personal property Sergeant Gerard Doran, Sergeant Andrew Salmon, Sergeant S. Nabors, Officer J. Kirby, Derrick Smith, and Officer R. Dolce deprived Plaintiff of his property without due process of the law.

## COUNT 8
### 42 U.S.C. § 1983 – Fourth Amendment – Illegal Seizure of Property

176.)  Sergeant Gerard Doran, Sergeant Andrew Salmon, Sergeant S. Nabors, Officer J. Kirby, Derrick. Smith, Officer R. Dolce, and Officer J. Hanby seized Plaintiff's property without probable cause, resulting in a deprivation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

## COUNT 9
### Conversion of Property

177.)  By taking possession of Plaintiff's property and never returning it, Defendants Gerard Doran, S. Nabors, Derrick Smith, J. Hanby, J. Kirby and Andrew Salmon are liable for conversion of property.

## COUNT 10
### Negligent Handling of Property

178.)  Defendants Gerard Doran, S. Nabors, Derrick Smith, J. Hanby, J. Kirby, and Andrew Salmon negligently handled Plaintiff's property in that they failed to execute due care in their roles as custodians of inmate property, and they lost Plaintiff's property as a proximate result of their lack of due care.

179.)  Storing Plaintiff's property was a mandatory duty of Gerard Doran, S. Nabors, Derrick Smith, J. Hanby, J. Kirby, and Andrew Salmon, and any mistakes or errors made in the handling of the property that lead to their loss was a matter of negligence in ministerial duties.

180.)  Defendants Gerard Doran, S. Nabors, Derrick Smith, J. Hanby, J. Kirby, and Andrew Salmon negligently lost the property of Plaintiff in the exercise of their duties as employees of the Department of Corrections.

181.)  The Department of Corrections is vicariously liable for its employees' negligent handling of Plaintiff's property.

## COUNT 11
### 42 U.S.C. § 1983 – Fourteenth Amendment – Procedural Due Process

182.) Defendant Amy Emrich denied Plaintiff's appeal of the .701 infraction even though Plaintiff was actively blocked from submitting it for adjudication.

183.) This fraudulent adjudication of Plaintiff's appeal denied Plaintiff due process.

184.) The illegal sustainment of the infraction interfered with Durham's liberty interest by setting back his parole date.

## COUNT 12
### Malicious Prosecution
### in Tort and under 42 U.S.C. § 1983 /Fourth Amendment

185.) Defendants Gil, Groninger, Wiggins, Early, and Lewis brought false charges of assaulting an officer against Plaintiff.

186.) The charges were brought without probable cause to believe Plaintiff had assaulted an officer.

187.) All these Defendants knew the charges were false but brought them anyway in an effort to cover over their illegal acts.

188.) The charges were thus motivated by actual malice.

189.) The proceeding terminated in Plaintiff's favor when the charges of assaulting an officer were dismissed.

190.) The elements of a malicious prosecution claim are actionable under Section 1983 because they constitute a violation of the Fourth Amendment of the U.S. Constitution.

## COUNT 13
### Civil Conspiracy

191.) Officer Nicole Miles, Nurse Lance Carver, Sergeant S. Hintz, Sergeant Brown, and Officers D. Martin, P. Mandap, T. Black, and John Does 1-2 all discussed and pre-meditated framing Milton Durham for false charges of making a threat, beating him, and/or subjecting him to false disciplinary charges.

192.) In going to his cell, to beat him and/or take him to disciplinary lockup, Sergeant S. Hintz and Officers D. Martin, P. Mandap, T. Black, and John Does 1-2, took a step in furtherance of the conspiracy.

16

193.) The conspiracy was motivated by a desire to punish Plaintiff for petitioning the government for a redress of grievances, or alternatively, the perception that Plaintiff had petitioned the government for a redress of grievances.

194.) Alternatively, the plan was to use excessive force against Plaintiff for purely sadistic purposes or as extrajudicial punishment.

195.) The conspiracy resulted in damages to Plaintiff.

196.) Sergeant Orlando Gil and Officers L. Wiggins, C. Groninger, P. Lewis, and J. Early all discussed and pre-meditated framing Milton Durham for false disciplinary charges and beating him.

197.) In going to his cell, to beat him and/or take him to disciplinary lockup, Sergeant Orlando Gil and Officers Wiggins, Groninger, Early, and Lewis took a step in furtherance of the conspiracy.

198.) The conspiracy was motivated by a desire to punish Plaintiff for petitioning the government for a redress of grievances, or alternatively, the perception that Plaintiff had petitioned the government for a redress of grievances.

199.) Alternatively, the plan was to use excessive force against Plaintiff for purely sadistic purposes or as extrajudicial punishment.

200.) The conspiracy resulted in damages to Plaintiff.

### COUNT 14
### 42 U.S.C. § 1985 – Conspiracy to Violate Civil Rights

201.) Sgts. Hintz and Brown, Nurse Lance Carver, and Officers Miles, Mandap, Martin, Black, and John Does 1-2 agreed to and carried out the 2012 beating of Plaintiff, thus violating Plaintiff's 8th Amendment rights, 4th Amendment rights, and 1st Amendment rights.

202.) Sgt. Gil and Officers Wiggins, Groninger, Lewis, and Early agreed to and carried out the 2017 beating of Plaintiff, thus violating Plaintiff's 8th Amendment, 4th Amendment, and 1st Amendment rights.

203.) Sgt A. Salmon, Sgt. Doran, Sgt. Nabors, and Officers Hanby, Smith, Kirby, Dolce all agreed to and carried out the taking of Plaintiff's property without due process or probable cause of illegal activity.

**Wherefore,** Plaintiff Milton Durham demands judgment against Defendants, together with

- Economic Damages

- Non-Economic Damages
- Punitive Damages
- Attorneys Fees
- Court Costs
- Such relief as the Court may deem just and appropriate.

                                              MICHAEL POREDA, ESQ.
                                              *Attorney for Plaintiff*

Date: July 17, 2020

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## DESIGNATION OF COUNSEL

Michael Poreda, Esq. is hereby designated as trial counsel.

## CERTIFICATION PURSUANT TO L.Civ.R. 11.2

      I certify that to the best of my knowledge and upon information and belief, the matter in controversy is not related to or the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

                                              MICHAEL POREDA, ESQ.
                                              *Attorney for Plaintiff*

Date: July 17, 2020